## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| OTA FRANCHISE CORPORATION, NEWPORT EXCHANGE HOLDINGS, INC., NEH SERVICES, INC., EYAL SHACHAR, SAMUEL SEIDEN, AND DARREN KIMOTO, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
|     Plaintiffs, | Case No. <u>1:20-cv-802</u> |
|     v. | |
| FEDERAL TRADE COMMISSION, | |
|     Defendant. | |

## <u>COMPLAINT</u>

Plaintiffs OTA Franchise Corporation, Newport Exchange Holdings, Inc., NEH Services, Inc., Eyal Shachar, Samuel Seiden, and Darren Kimoto (collectively, "Plaintiffs")[1] hereby file their Complaint against the Federal Trade Commission ("FTC") and allege as follows.

---

[1]     Plaintiffs OTA Franchise Corporation and Newport Exchange Holdings, Inc. operate under the name "Online Trading Academy." OTA Franchise Corporation, Newport Exchange Holdings, Inc., and NEH Services, Inc. are referred to collectively throughout as "OTA" or, alternatively, "the Corporate Plaintiffs."

## OVERVIEW

1.      Plaintiffs bring this action to obtain a declaratory judgment and an injunction to stop the Federal Trade Commission ("FTC") from exercising powers that it does not possess in an attempt to stamp out an industry that it does not like.  The FTC is engaged in a campaign to eradicate nontraditional forms of education, and, as will be demonstrated, it will go to extreme and concerning lengths to do so.  With the full weight and resources of the government at its disposal, the FTC wages this campaign indiscriminately, without regard to the business merits of its targets, the specific facts of the case, or the devastation the abusive exercise of its power has caused and will continue to cause legitimate businesses like OTA, its employees, its independent franchise owners, and its thousands of satisfied customers.

2.      OTA is a leading provider of financial education.  It offers instruction and training in investment and trading techniques at 48 brick-and-mortar locations around the world, as well as through live and on-demand online courses.  OTA has been providing exceptional financial education to students for over twenty-two years.

3.      OTA conducts free preview events ("Preview"), at which students are introduced to the education provided by OTA and are then offered access to three-day "Market Timing Orientation" (MTO) workshops.  MTO attendees may choose to purchase additional advanced training—including, but not limited to, a seven-day core course, four different asset classes, and/or continued practice and application courses for each asset class.

4.      OTA's methods work.  Students who follow and use the rules and techniques that OTA teaches can and do make money and gain valuable financial knowledge and confidence. Moreover, OTA students are overwhelmingly satisfied with the education that OTA provides.

5.      At the same time, OTA discloses to students the risks of trading and acknowledges that students will lose money on some trades.  For this reason, starting at the free Preview, continuing to the MTO, and throughout all of the education it provides, OTA emphasizes risk management, and provides rules and strategies to avoid big losses.  Moreover, OTA includes clear and conspicuous disclosures at the Preview, MTO, and throughout its courses, that trading involves high risk and that students can lose money.

6.      Nevertheless, as part of a campaign to eradicate education on how to make money, the FTC has set its sights upon OTA.  OTA first learned that a government regulator was investigating the company in early 2019 when it was blindsided by notification from its bank—a vital relationship OTA had in place for many years—that the bank was freezing OTA's credit line and ending its long-term relationship with OTA.  OTA was informed that the government led the bank to believe that OTA would not survive the investigation.

7.      After making various inquiries, OTA learned that it was the FTC that had contacted OTA's bank, purportedly to gather information that OTA would have voluntarily provided the FTC.

8.      In communicating with OTA's bank, the FTC appears to be copying discredited tactics used by the FDIC and Department of Justice in "Operation Choke Point."  Operation Choke Point was a clandestine operation whereby the FDIC choked out legitimate businesses it did not like by pressuring banks to sever relationships with such businesses.[2]  This is precisely what the FTC did to OTA.  The FTC attempted to put OTA out of business without the need for an

---

[2]      The FDIC's own former chairman, William Isaac, called Operation Choke Point "one of the most dangerous programs I have experienced in my 45 years of service as a bank regulator, bank attorney and consultant, and bank board member."  William M. Isaac, *Congress needs to choke off Operation Choke Point*, THE HILL, July 14, 2014, https://thehill.com/blogs/congress-blog/economy-budget/212164-congress-needs-to-choke-off-operation-choke-point.

investigation or any due process.  Recently, the FDIC's "Operation Choke Point" was shut down, but only after loud and nearly universal rebuke from concerned officials and citizens, a strong bipartisan bill which passed 395-2 in the House of Representatives, and a successful lawsuit.[3]

9. Once the FTC admitted to OTA that it was indeed the FTC that was taking aim at OTA, OTA immediately offered to cooperate and has consistently cooperated with the FTC's investigation.  OTA has thoroughly responded to the FTC's requests for documents and information, even without receiving a Civil Investigative Demand (CID).  OTA has made no fewer than twenty-four voluntary submissions to the FTC.

10. Undeterred by the evidence that what OTA teaches works, the FTC now threatens to bring a lawsuit alleging that Plaintiffs have violated section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and the Consumer Review Fairness Act of 2016 ("CRFA"), 15 U.S.C. § 45b.  Specifically, in a draft complaint provided to Plaintiffs on January 29, 2020, the FTC alleges that Plaintiffs have made false or unsubstantiated earnings claims, and other misrepresentations, in connection with the advertising, marketing, promotion, offering for sale, or sale of OTA training, in violation of section 5(a) of the FTC Act, 15 U.S.C. § 45(a).  The draft complaint further alleges that the Corporate Plaintiffs and Mr. Shachar have offered "form contract[s]" containing non-disparagement provisions prohibited by the CRFA.

---

[3] *See, e.g.*, Blaine Luetkemeyer, *Evidence is now clear: Operation Choke Point hurt lawful businesses*, AMERICAN BANKER, Oct. 14, 2018, https://www.americanbanker.com/opinion/evidence-is-now-clear-operation-choke-point-hurt-lawful-businesses (criticizing Operation Choke Point and discussing bipartisan passage of House bill); Press Release, *FDIC Resolves Payday Lender Lawsuit*, https://www.fdic.gov/news/news/press/2019/pr19040.html (May 22, 2019) (discussing FDIC's settlement of lawsuit, in which FDIC acknowledged that "certain employees acted in a manner inconsistent with FDIC policies with respect to payday lenders in what has been generically described as 'Operation Choke Point,'" and clarified that "[r]egulatory threats, undue pressure, coercion, and intimidation designed to restrict access to financial services for lawful businesses have no place at the FDIC").

11.     The representations that the FTC takes issue with in connection with OTA's training are neither false nor unsubstantiated.  OTA students who follow and use the rules and techniques that OTA teaches can and do earn money and they learn valuable financial knowledge.

12.     Moreover, the FTC threatens to seek equitable monetary relief from Plaintiffs under section 13(b) of the FTC Act, 15 U.S.C. § 53(b), for alleged violations of section 5(a) of the FTC Act, in the form of restitution, the refund of monies paid, and disgorgement of allegedly ill-gotten monies.  The FTC has indicated that it seeks to impose joint and several liability upon each of the Plaintiffs for the full amount of gross sales made at all OTA locations.  However, under the plain statutory language, and controlling Seventh Circuit case law, the FTC is not authorized to obtain equitable monetary relief under section 13(b).

13.     Furthermore, the FTC seeks to impose a level of substantiation for any earnings claims made by OTA that impermissibly restricts commercial speech, in violation of the First Amendment.

14.     Finally, the FTC seeks injunctive and equitable monetary relief from OTA and Mr. Shachar under the CRFA, even though OTA and Mr. Shachar have not violated the law.  The refund "settlement agreements" the FTC points to are not "form contract[s]," per the plain language of the statute.  They are not "used in the course of selling or leasing. . . goods or services"; they do not use standardized terms; and they do not preclude consumer negotiations.  Quite the opposite: these are negotiated agreements under which Plaintiffs *refund* money to consumers.

15.     Because the FTC threatens the Plaintiffs with catastrophic relief to which the FTC is not entitled and seeks to impose substantiation requirements on the Plaintiffs that trample the Plaintiffs' First Amendment rights, Plaintiffs were left with no choice but to file this suit to declare that the FTC's efforts to obtain monetary relief are invalid and that the FTC's enforcement threats

5

violate the First Amendment and the terms of the CRFA. Unless stopped, the FTC's actions will impose irreparable harm on Plaintiffs. Indeed the FTC's contact with OTA's bank caused the bank to sever a stable and long-standing relationship with OTA. The harm that a lawsuit seeking the draconian relief that the FTC has threatened, as unfounded as it may be, would do to OTA's business, consumer, and franchise relationships would be even more devastating and irreparable. Once OTA's business is destroyed, it cannot be resurrected.

## JURISDICTION AND VENUE

16.     This is an action for declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 related to an actual controversy arising under 15 U.S.C. § 45(a), 15 U.S.C. §§ 53(b) and 57b, and 15 U.S.C. § 45b.

17.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the action arises under the laws and Constitution of the United States, and under 28 U.S.C. § 1337(a) because the controversy arises under the Federal Trade Commission Act. Plaintiffs' cause of action is based upon, and seeks judicial interpretation of, 15 U.S.C. § 45(a) and 15 U.S.C. § 45b.

18.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), 1391(b)(2), 1391(c)(2), 1391(e)(1), and 15 U.S.C. § 53(b). A substantial part of the events giving rise to the causes of action occurred within this District. Mr. Seiden resides in this District, and he received and responded to a CID related to this matter from the FTC in this District. Much of the conduct the FTC alleges in its draft complaint against Mr. Seiden occurred in this District. Additionally, OTA maintains a franchise location within this District. The advertising and marketing practices that the FTC criticizes in its draft complaint include advertising and marketing directed at residents of this District.

## PARTIES

19. Plaintiff OTA Franchise Corporation ("OTA Corp."), also doing business as Online Trading Academy, is a Nevada corporation with its principal place of business at 17780 Fitch Avenue, Irvine, California 92614. OTA Corp. offers courses at training facilities owned and operated either by OTA or by franchisees in various states—including a franchise location in Illinois—and internationally. OTA Corp. transacts business throughout the United States, including in this District.

20. Plaintiff Newport Exchange Holdings, Inc. ("NE Holdings"), also doing business as Online Trading Academy, is a California corporation with its principal place of business at 17780 Fitch Avenue, Irvine, California 92614. NE Holdings transacts business throughout the United States, including in this District.

21. Plaintiff NEH Services, Inc. ("NEH Services"), is a California corporation with its principal place of business at 17780 Fitch Avenue, Irvine, California 92614. NEH Services transacts business throughout the United States, including in this District.

22. Plaintiff Eyal Shachar (also known as Eyal Shahar, and hereafter "Shahar"), is the Chief Executive Officer, sole Director, and former President of OTA Corp. He is also the founder and president of NE Holdings, and the CEO of NEH Services. Mr. Shahar resides in California.

23. Plaintiff Samuel R. Seiden ("Seiden") has served in a variety of roles at OTA. According to the FTC's draft complaint, "Mr. Seiden is the creator and most visible exponent of [OTA's] proprietary trading strategy to consumers and the investing public" and "has featured prominently in OTA's marketing and has been held out to consumers at OTA's live events as the creator of OTA's patent and 'an impeccable master' of OTA's trading strategy." Mr. Seiden

resides in Illinois, in this District. To the extent the FTC's allegations should be credited, the alleged acts by Mr. Seiden largely took place in Illinois and this District.

24.     Plaintiff Darren Kimoto ("Kimoto") is one of OTA's MTO instructors. Mr. Kimoto also oversees the MTO instructors, providing training and compliance updates throughout the year. Kimoto resides in Utah. He has taught for OTA in this District.

25.     Defendant FTC is an independent agency of the United States government. 15 U.S.C. § 41. Among the statutes it administers are section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a), which prohibits "unfair or deceptive acts or practices in or affecting commerce," and 15 U.S.C. § 45b, which prohibits certain non-disparagement provisions in "form contract[s]." The FTC maintains a substantial presence in this District, including a Regional Office in Chicago and the employment of multiple attorneys and other professionals working out of that office.

## FACTS

26.     Mr. Shahar founded OTA over twenty-two years ago, with the goal of providing exceptional financial education, focused on risk management, to retail investors. OTA achieved that goal, becoming a leading provider of financial education to thousands of consumers throughout the United States and the world.

27.     OTA has a long-tenured and committed executive team, all of whom are dedicated to OTA's students. To that end, OTA continually re-invests in its consumers. Most recently, OTA created a proprietary trading platform, called CliK, that integrates many of OTA's risk management strategies and rules into the platform. Not only was CliK a multi-million-dollar investment by the company, created solely to enhance customers' experience and increase their

chances for success, but OTA provided it to students free of charge. CliK is still in its infancy, and OTA continues to actively develop and add features to it—all for the benefit of OTA students.

28.     OTA has an A+ Better Business Bureau rating and has won numerous workplace awards. OTA also has earned the prestigious status of a Certified B-Corporation—by demonstrating commitment to considering the impact of its decisions on its workers, customers, suppliers, community, and the environment.

29.     OTA advertises via various mediums, including television and radio broadcast, direct mail, email, and online. OTA targets its advertising at generally knowledgeable, well-educated consumers. Indeed, OTA students have an average household income of over $95,000—a number that is 59% higher than the U.S. median according to 2017 Census data—and are, on average, 56 years old. Additionally, 65% of MTO buyers are college graduates—nearly double the overall percentage of college graduates among United States residents in 2017.

30.     OTA provides a broad range of educational courses to consumers. Typically, a prospective student will start with a half-day free Preview event, where an OTA presenter introduces the company and provides basic financial and economic concepts relevant to trading. Then, a consumer typically attends a three-day Market Timing Orientation (MTO)—generally for no more than $300—where an OTA instructor expands upon the concepts introduced at the Preview, including familiarizing consumers with OTA's step-by-step methodology for uncovering trading opportunities (called Core Strategy), and training in each of the asset classes OTA teaches, including stocks, futures, options, and forex. The MTO also emphasizes the concepts of supply and demand, as well as risk management, and explains their importance to trading in the markets.

31.     After the MTO, consumers have a broad range of financial education courses to choose from. Typically, a consumer will first take OTA's Core Strategy course—a seven-day

immersive course where students are introduced to OTA's core concepts and strategies. The course culminates in two full days of live-trading practice by the students, performed with real money in OTA accounts.

32.     After the Core Strategy course, students often will take an extended learning track (XLT) online course. The Core Strategy XLT reinforces the underlying principles behind Core Strategy and provides experiential learning opportunities to the students.

33.     OTA also offers courses in stocks, futures, options, and forex—all of which have accompanying XLTs for continued learning and practice.

34.     In addition to the courses, OTA also provides its students with a number of tools to enhance their training. Among those tools are trade plans—where students lay out their personal rules and risk parameters—access to OTA's online portal called "MyOTA," daily examples of high-probability trading zones, and other detailed trade set-ups. Additional resources and education are also available to students on MyOTA.

35.     OTA has built its education on a foundation of teaching students risk management. OTA makes clear to students, starting at the Preview, continuing at the MTO, and expanded upon in all courses and XLTs, that trading involves risk and that students will lose money on some trades. OTA, however, provides clear rules and strategies designed to ensure that losses are small, not big, and that students effectively manage their risk. OTA teaches risk management throughout each step of OTA's education.

36.     OTA discloses the risks of trading to its students and prospective students. OTA includes clear and conspicuous disclosures at both the Preview and MTO that trading involves high risk, and that students can lose money. OTA makes clear in these disclosures that the Preview and MTO do not teach students everything they need to know to become active traders—additional

10

education is required.  For example, a disclaimer included in a 2019 Course Workbook for OTA's MTO states: "**All trading involves high risk; past performance is not necessarily indicative of future results.  There have been no promises, guarantees or warranties suggesting that any trading – training will result in a profit or will not result in a loss."**  (emphasis in original). The disclaimers also emphasize that "individual performance depends upon the individual skills, time availability and dedication of each Student in the training program."  Similar disclosures are included throughout OTA's courses as well.

37.     OTA teaches via live, in-person sessions, as well as online in both live and on-demand formats.

38.     Exemplifying its commitment to the education of its students,  OTA offers lifetime learning to students, allowing them to re-take courses as many times as they like, in any center around the world or online, without any additional charges.  As a result,  students can, and often do, refresh on concepts and lessons whenever their schedules or lifestyles allow.

39.     OTA's instructors have many years of experience in the financial markets and trading following OTA's methodology.  OTA puts instructors through a rigorous, four-phase training and onboarding process.  Students constantly provide feedback on the effectiveness of OTA instructors through post-class surveys, which OTA uses to improve instructor quality.  Every student survey score is posted online; currently, the results of over 197,000 such scores, with an overall satisfaction score of 94%, are shown on OTA's website.  Moreover, in contrast to many competitors, OTA generally maintains student-to-instructor ratios of 25:1 or lower in its physical classes, providing a more intimate and effective learning environment.

40. Over its twenty-two-year history, OTA has provided exceptional financial education to over 70,000 students. Students are extremely satisfied with the education they receive from OTA.

41. Most importantly, OTA's education works. Students who follow and use the rules and techniques that OTA teaches can and do make money and gain valuable financial education and confidence.

## THE FTC'S OVERREACH

42. As indicated above, in early 2019, OTA discovered that the FTC was looking into its advertising and other business practices after OTA's bank abruptly severed ties with OTA in response to being intimidated by the government. OTA's sudden loss of its long-established banking relationship was a severe blow, but fortunately for OTA, it was not fatal.

43. Having survived the FTC's initial contact with OTA's bank, OTA proactively reached out to the FTC and committed to working with the government throughout the FTC's investigatory process.

44. The FTC never needed to issue a CID to OTA. Instead, OTA voluntarily responded to a series of access letters and follow-on requests from the FTC. In total, OTA provided over twenty written responses, over 28,000 pages of documents, and met with FTC staff on two occasions. OTA's goal in all of this cooperation was to show the FTC that OTA is a good actor and that the FTC's investigation was ill-founded.

45. In November 2019, the FTC issued CIDs to a handful of OTA instructors. Mr. Kimoto and Mr. Seiden were two of the CID recipients. Both Mr. Kimoto and Mr. Seiden provided fulsome responses and accompanying documents to the FTC.

46.     In December 2019, OTA submitted an expert report from a finance expert and professor with over twenty-five years of experience in the financial markets, including prior work at the U.S. Securities and Exchange Commission and U.S. Commodity Futures Trading Commission. The expert report concluded that OTA's educational materials and the principles underlying them are based on sound financial principles and provide significant utility to students. The finance expert further explained that the education OTA provides enables students who follow the principles and use the techniques taught by OTA to make money through trading and investing.

47.     Despite OTA's cooperation and the compelling submission by OTA's expert, the FTC continued on its apparently predetermined quest to shut down OTA.

48.     On January 28, 2020, in response to OTA's counsel's request for a status update, the FTC's staff informed OTA's counsel that it had drafted a complaint and had recommended that the Commission approve the filing of that complaint in court.

49.     The next day, on January 29, 2020, the FTC provided a draft complaint, laying out its theories of violations and harm for the first time. The complaint included claims against the Corporate Plaintiffs, as well as Messrs. Shahar, Seiden, and Kimoto, and stated the FTC's intention to hold all of them jointly and severally liable. The FTC later elaborated on the relief it is seeking from the Plaintiffs: all of the money OTA has ever made, and a permanent ban on offering financial education. The mere assertion of a claim for this extreme and unjustified relief would interfere with numerous relationships on which the Plaintiffs' business relies causing irreparable harm to Plaintiffs. If Plaintiffs' business is destroyed, it cannot be rebuilt, and thousands of students with lifelong learning privileges will be harmed. The FTC's conduct cannot be permitted, particularly when the relief that the FTC seeks is not attainable under the law.

50.     The FTC's conduct demonstrates that the FTC is not interested in working constructively with companies such as OTA to address any practices that the FTC might deem problematic.  Rather, the FTC is hostile to and is engaged in a campaign to stamp out companies that offer nontraditional forms of education.  The FTC wages this campaign without regard to the realities of how a particular company such as OTA operates, and without regard to the harm that its actions may inflict upon OTA, its employees, its independent franchise owners, and its students.

51.     The FTC's campaign against providers of nontraditional forms of education is part and parcel with the FTC's broader overzealous approach to enforcement—an approach that was aptly captured by Commissioner Slaughter's statement that the FTC has an "obligation" to bring lawsuits "even if we're not likely to win."[4]

### THE FTC'S PROPOSED CLAIMS ARE WITHOUT MERIT, OVERSTEP ITS STATUTORY AUTHORITY, AND VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS

52.     Plaintiffs have not violated 15 U.S.C. § 45(a), and the FTC does not have authority to obtain the relief it seeks.

53.     Specifically, the FTC's draft complaint seeks equitable monetary relief from all Plaintiffs, jointly and severally, under section 13(b) of the FTC Act, 15 U.S.C. § 53(b), for alleged violations of 15 U.S.C. § 45(a).[5]  This is impermissible under the clear statutory language and binding Seventh Circuit law.  The draconian nature of the monetary relief sought—holding Plaintiffs jointly and severally liable for all sales made at all OTA locations—is especially egregious and warrants court intervention here.

---

[4]     *See* Matthew Perlman, *FTC Commissioner Wants to Bring the Hard Merger Cases*, LAW360, June 20, 2019, https://www.law360.com/articles/1171376/ftc-commissioner-wants-to-bring-the-hard-merger-cases (quoting Commissioner Slaughter).

[5]     In its draft complaint, the FTC seeks relief under section 19 of the FTC Act, 15 U.S.C. § 57b, only with respect to its CRFA claim.

54.     In *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019), the Seventh

Circuit expressly held that "section 13(b) does not authorize restitutionary relief." *Id.* at 767.  The

court's holding was based on its conclusion that binding Supreme Court precedent[6] prohibits the

judicial implication of equitable monetary relief under section 13(b) in light of the FTC Act's

express provision for restitution under other provisions of the FTC Act, which "impose a detailed

framework that the Commission must follow before obtaining a restitution order."  *Id.* at 774.  As

the *Credit Bureau* court explained, "[r]ather than presuming that Congress authorizes the judiciary

to supplement express statutory remedies, the Court now recognizes that 'the express provision of

one method of enforcing a substantive rule suggests that Congress intended to preclude others.'"

*Id.* at 782 (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385 (2015)).

55.     After noting the "obvious" fact that "[r]estitution isn't an injunction," the *Credit*

*Bureau* court stated: "nothing in the text or structure of the [FTC Act] supports an implied right to

restitution in section 13(b), which by its terms authorizes only injunctions."  *Id.* at 771, 775.  Thus,

the court read section 13(b) to "mean what it plainly says"—that is, to authorize only injunctive

relief, and not restitution.  *Id.* at 785; *see also id.* at 780 (quoting *Middlesex Cty. Sewerage Auth.*

*v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981)) ("In the absence of strong indicia of a contrary

congressional intent, we are compelled to conclude that Congress provided precisely the remedies

it considered appropriate.").  Accordingly, the FTC may not obtain equitable monetary relief under

section 13(b) of the FTC Act.  Plaintiffs seek a declaration and injunctive relief confirming this.

---

[6]      In particular, the *Credit Bureau* court emphasized the Supreme Court's ruling in *Meghrig v. KFC Western, Inc.*, 516 U.S. 479 (1996), in which the Court refused to find an implied restitutionary remedy in a provision of the Resource Conservation and Recovery Act of 1976 ("RCRA") that authorized courts to grant injunctive relief, stating: "It is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."  *Credit Bureau*, 937 F.3d at 781 (quoting *Meghrig*, 516 U.S. at 488).

56.     Additionally, the representations made by Plaintiffs in connection with OTA's training are neither false nor unsubstantiated.  OTA students who follow and use the rules and lessons taught by OTA can and do make money and learn valuable financial knowledge.  Students are also overwhelmingly satisfied with the education and information that OTA provides.  Student surveys conducted by the company confirm this, and OTA is in constant communication with its students, checking in on and confirming their progress along the way.     Accordingly, Plaintiffs seek a declaration that they have not violated 15 U.S.C. § 45(a), and further injunctive relief to enforce the Court's determination.

57.     Furthermore, the substantiation requirements that the FTC seeks to impose upon Plaintiffs with respect to earnings claims are contrary to the First Amendment's protections for commercial speech.  The Supreme Court has held that, with respect to commercial speech that concerns lawful activity and is not misleading, any government restrictions on that speech must "directly advance[]" a "substantial" governmental interest and must not be "more extensive than is necessary to serve that interest."  *Central Hudson Gas & Electric Corp. v. Pub. Service Comm'n of New York*, 447 U.S. 557, 566 (1980).

58.     Plaintiffs' earnings claims concern lawful activity and are not misleading.  As noted above, OTA submitted an expert report to the FTC from a finance expert explaining that OTA's educational methods are sound; if students follow those methods, they can and do make money.

59.     According to the FTC's draft complaint, the basis of the FTC's claim that Plaintiffs have made false or unsubstantiated earnings claims is that Plaintiffs "do not track the trading performance of their customers" and "have no data that would allow them to predict the trading performance of their customers."  Thus, the FTC seeks to mandate that, as a precondition for making statements regarding the levels of success that students may be able to achieve through

OTA's training, Plaintiffs must track and/or gather data—including sensitive financial information triggering the applicability of other statutes—sufficient to predict students' trading performance. In so doing, the FTC impermissibly burdens Plaintiffs' commercial speech rights and potentially invades the privacy of OTA's students. The FTC's substantiation requirements are "more extensive than is necessary to serve" any "substantial" governmental interest that the requirements might be found to "directly advance[]." *Central Hudson*, 447 U.S. at 566.

60.     Moreover, the draft complaint asserts that Plaintiffs' clear and informative disclaimers in their materials "do not cure their deception." These allegations, again, show the FTC's overreach.

61.     Courts and government agencies alike have found that disclaimers can effectively remedy potentially misleading statements.[7] Significantly, the Supreme Court has "repeatedly point[ed] to disclaimers as constitutionally preferable to outright suppression." *Pearson v. Shalala*, 164 F.3d 650, 657 (D.C. Cir. 1999) (citing cases). Indeed, "when government chooses a policy of suppression over disclosure—at least where there is no showing that disclosure would not suffice to cure misleadingness—government disregards a 'far less restrictive' means," in violation of *Central Hudson*'s requirement that "the fit between the legislature's ends and means

---

[7]     *See, e.g.*, *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1315 (2d Cir. 1987) (In a trademark infringement action, although finding Showtime's disclaimer to be inadequate, the court noted that "the use of disclaimers [is] an adequate remedy when they are sufficient to avoid substantially the risk of consumer confusion.") (citing *Springs Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 355 (2d Cir. 1983); *Berlitz Schools of Languages v. Everest House*, 619 F.2d 211, 215 (2d Cir. 1980)); *see also id.* (citing *Soltex Polymer Corporation v. Fortex Industries, Inc.*, 832 F.2d 1325 (2d Cir. 1987) (minimal to moderate amount of consumer confusion found by district court could be cured effectively through the use of a disclaimer)); *Pearson v. Shalala*, 164 F.3d 650, 658–59 (D.C. Cir. 1999) (citing *American Home Prods. Corp. v. FTC*, 695 F.2d 681, 684, 696–702 (3d Cir. 1982)) (FDA concluded that scientific literature did not support a superiority claim. The court found at least one study providing evidence to support the claim, and the court suspected "that a clarifying disclaimer could be added to the effect that '[t]he evidence in support of this claim is inconclusive.'"); *Am. Home Prods. Corp.*, 695 F.2d at 684 (affirming an FTC administrative order prohibiting certain superiority claims, while noting that "[American Home Products] is allowed, however, to assert superiority, provided it discloses that the superiority is open to substantial question").

is a 'reasonable' one." *Id.* at 657–58 (quoting *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 480 (1989) (discussing *Central Hudson*)). Yet in this case, the FTC— after including verbatim pages of OTA disclosures in its draft complaint—brushes aside the clear and conspicuous disclaimers provided to OTA students and instead seeks to suppress Plaintiffs' speech[8] unless Plaintiffs can meet onerous substantiation requirements for their earnings claims. Plaintiffs seek a declaration that the FTC's actions unlawfully infringe Plaintiffs' First Amendment rights and further injunctive relief rejecting the FTC's unreasonable approach here.

62.      In the draft complaint, the FTC also attempts to hold the Corporate Plaintiffs and Mr. Shahar liable for violations of the Consumer Review Fairness Act of 2016 ("CRFA"), 15 U.S.C. § 45b, for purportedly conditioning *refunds* on the consumer signing a document barring the consumer from posting negative reviews about OTA. Under the plain language of the statute, the Corporate Plaintiffs and Mr. Shahar have not violated the CRFA.

63.      For the CRFA to be triggered, an accused party must enter into a "form contract" with a consumer. The term "form contract" means "a contract with standardized terms (i) used by a person in the course of selling or leasing the person's goods or services, and (ii) imposed on an individual without a meaningful opportunity for such individual to negotiate the standardized terms." 15 U.S.C. § 45b(a)(3).

64.      The contracts that the FTC alleges violate the CRFA are settlement agreements in which OTA provides a *refund* of money previously paid by the consumer. Often, such refunds are provided even though the consumer has consumed the education from OTA. Providing a refund to a consumer is plainly not an act taken "in the course of selling or leasing" OTA's services.

---

[8]      As noted previously, the FTC has also indicated that it intends to seek to permanently ban Plaintiffs from offering financial education.

65. Additionally, OTA's settlement agreements involving refunds are negotiated instruments between OTA and the consumer, sometimes including the consumer's attorney. They are not contracts "with standardized terms," nor are consumers deprived of a meaningful opportunity to seek a refund or to negotiate the terms of that refund.

66. The CRFA was passed in late 2016. Due to its recent passage there is a dearth of case law interpreting the statute and its terms. Plaintiffs therefore seek a declaration that the contracts OTA enters into providing refunds to consumers are not "form contracts" as that term is defined in the CRFA, that the Corporate Plaintiffs and Mr. Shahar did not violate the CRFA, and further injunctive relief to enforce the Court's determination.

## CAUSES OF ACTION

### COUNT I
### DECLARATORY AND INJUNCTIVE RELIEF—NO ENTITLEMENT TO EQUITABLE MONETARY RELIEF UNDER 15 U.S.C. § 53(b)

67. Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

68. As a result of the FTC's threatened litigation against Plaintiffs seeking relief, including equitable monetary relief, under 15 U.S.C. § 53(b), an actual and substantial controversy with sufficient immediacy exists between Plaintiffs and the FTC. Specifically, the FTC has threatened joint and several liability against each of the Plaintiffs for all of the sales made at all OTA locations.

69. The FTC is not entitled to equitable monetary relief under 15 U.S.C. § 53(b) because 15 U.S.C. § 53(b) only authorizes injunctive relief.

70.     Accordingly, Plaintiffs are entitled to a declaration that the FTC is not entitled to equitable monetary relief under 15 U.S.C. § 53(b) and an injunction against any action by the FTC seeking equitable monetary relief pursuant to 15 U.S.C. § 53(b).

71.     Plaintiffs will be irreparably harmed if the Court does not provide the requested relief.

## COUNT II
## DECLARATORY AND INJUNCTIVE RELIEF—NO VIOLATION OF 15 U.S.C. § 45(a)

72.     Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

73.     As a result of the FTC's threatened litigation against Plaintiffs asserting that Plaintiffs have engaged in deceptive acts or practices, an actual and substantial controversy with sufficient immediacy exists between Plaintiffs and the FTC.

74.     Plaintiffs have not and are not engaged in deceptive acts or practices because students who follow the rules and techniques that OTA teaches can and do make money and gain financial knowledge.

75.     Accordingly, Plaintiffs are entitled to a declaration that they have not violated 15 U.S.C. § 45(a) and an injunction against any further action by the FTC premised on an alleged violation of 15 U.S.C. § 45(a) arising from the actions at issue in this litigation.

76.     Plaintiffs will be irreparably harmed if the Court does not provide the requested relief.

## COUNT III
## DECLARATORY AND INJUNCTIVE RELIEF—THE FTC'S SUBSTANTIATION
## REQUIREMENTS VIOLATE THE FIRST AMENDMENT

77.     Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

78.     As a result of the FTC's threatened litigation against Plaintiffs asserting that Plaintiffs have engaged in deceptive acts or practices, an actual and substantial controversy with sufficient immediacy exists between Plaintiffs and the FTC.

79.     The level of substantiation that the FTC seeks to impose and require with respect to Plaintiffs' earnings claims impermissibly restricts commercial speech in violation of the First Amendment.

80.     Accordingly, Plaintiffs are entitled to a declaration that the FTC is not entitled to any relief for alleged violations of 15 U.S.C. § 45(a) premised on Plaintiffs' alleged failure to substantiate earnings claims.  Plaintiffs are further entitled to an injunction against any action by the FTC for alleged violations of 15 U.S.C. § 45(a) premised on Plaintiffs' alleged failure to substantiate earnings claims arising from the actions at issue in this litigation.

81.     Plaintiffs will be irreparably harmed if the Court does not provide the requested relief.

## COUNT IV
## NO VIOLATION OF 15 U.S.C. § 45b

82.     Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

83.     As a result of the FTC's threatened litigation against the Corporate Plaintiffs and Mr. Shahar asserting that they have violated the CRFA, an actual and substantial controversy with sufficient immediacy exists between the Corporate Plaintiffs and Mr. Shahar and the FTC.

84.     The Corporate Plaintiffs and Mr. Shahar have not violated 15 U.S.C. § 45b because entering into a negotiated settlement agreement that provides a consumer a refund is not an act taken "in the course of selling or leasing" OTA's services, the agreements lack "standardized

terms," and consumers are provided with a "meaningful opportunity . . . to negotiate." Thus, these settlement agreements are not a "form contract" under the plain language of the CRFA.

85. Accordingly, Plaintiffs are entitled to a declaration that the FTC is not entitled to any relief under 15 U.S.C. § 45b and an injunction against any action by the FTC premised on any alleged violation of 15 U.S.C. § 45b arising from the actions at issue in this litigation.

86. Corporate Plaintiffs and Mr. Shahar will be irreparably harmed if the Court does not provide the requested relief.

<h2 style="text-align:center">PRAYER FOR RELIEF</h2>

WHEREFORE Plaintiffs pray for judgment as follows:

a. A declaration that the FTC is not entitled to equitable monetary relief under 15 U.S.C. § 53(b).

b. An injunction against any action by the FTC seeking equitable monetary relief pursuant to 15 U.S.C. § 53(b).

c. A declaration that Plaintiffs have not violated 15 U.S.C. § 45(a).

d. An injunction against any further action by the FTC premised on an alleged violation of 15 U.S.C. § 45(a) arising from the actions at issue in this litigation.

e. A declaration that the FTC is not entitled to any relief for alleged violations of 15 U.S.C. § 45(a) premised on Plaintiffs' alleged failure to substantiate earnings claims.

f. An injunction against any action by the FTC for alleged violations of 15 U.S.C. § 45(a) premised on Plaintiffs' alleged failure to substantiate earnings claims arising from the actions at issue in this litigation.

g. A declaration that the FTC is not entitled to any relief under 15 U.S.C. § 45b.

h. An injunction against any action by the FTC premised on any alleged violation of 15

U.S.C. § 45b arising from the actions at issue in this litigation.

i. Any further relief to which Plaintiffs may be entitled.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues so triable.

DATED this 4th day of February, 2020.

Respectfully submitted,

/s/ *J. Douglas Baldridge*
J. Douglas Baldridge
Eric S. Berman (*pro hac vice forthcoming*)
Katherine Wright Morrone (*pro hac vice forthcoming*)
**Venable LLP**
600 Massachusetts Ave. NW
Washington, DC 20001
(202) 344-4000
jbaldridge@venable.com
esberman@venable.com
kwmorrone@venable.com

Leonard L. Gordon (*pro hac vice forthcoming*)
**Venable LLP**
Rockefeller Center
1270 Avenue of the Americas
24th Floor
New York, New York 10020
(212) 307-5500
llgordon@venable.com

Kirstin B. Ives
**Falkenberg Ives LLP**
230 W. Monroe, Suite 2220
Chicago, Illinois 60606
(312) 566-4803
kbi@falkenbergives.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 4, 2020, I caused a true and correct copy of the

foregoing Complaint to be served in accordance with Rule 4 of the Federal Rules of Civil

Procedure.

/s/ <i>J. Douglas Baldridge</i>
J. Douglas Baldridge
